# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

AKEEM RYAN BOWEN,

      Petitioner,

v.                                  Case No. 8:20-cv-281-VMC-TGW

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

## ORDER

Akeem Ryan Bowen, a Florida prisoner, timely filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1.) Respondent filed a response opposing the petition. (Doc. 8.) Bowen filed a reply. (Doc. 12.) Upon consideration, the petition is **DENIED**.

## I.   Procedural History

A state-court jury convicted Bowen of armed burglary of a dwelling and grand theft. (Doc. 9-2, Ex. 1, pp. 138-39.) After finding that he qualified as a prison releasee reoffender, the state trial court sentenced Bowen to concurrent terms of life imprisonment on the burglary count and five years' imprisonment on the grand-theft count. (*Id.*, pp. 160, 164.) The state appellate court *per curiam* affirmed the convictions and sentences. (Doc. 9-3, Ex. 5.) Bowen then sought postconviction relief under Florida Rule of Criminal Procedure 3.850. (Doc. 9-4, Ex. 11, pp. 22-43, 48-66.) The

1

state trial court denied Bowen's claims, and the state appellate court *per curiam* affirmed the denial of relief. (*Id.*, pp. 68-77, 205-11; Doc. 9-5, Ex. 14.) Bowen also filed a petition alleging ineffective assistance of appellate counsel under Florida Rule of Appellate Procedure 9.141(d). (Doc. 9-3, Ex. 9.) The state appellate court denied Bowen's petition. (*Id.*, Ex. 10.)

## II.   <u>Facts; Trial Testimony</u>[1]

On the evening of December 18, 2013, Aleister Campbell came home from work to find that his house had been burglarized. Campbell shared the house with his girlfriend, Kathyrn Valentine. The burglar had entered by breaking the glass on the rear sliding door. Several items were missing when Campbell came home, including a Glock handgun, a Canon Rebel T3i camera, a Discover credit card, and various items of jewelry. The couple's "main" television had been removed from the house and left in the backyard. (Doc. 9-2, Ex. 1c, p. 119.) Campbell called 911, and the police began to investigate.

The next day, Valentine learned that someone had tried to use her credit card at a nearby Publix supermarket and Marathon gas station. Police recovered surveillance footage from those two locations. The Publix footage showed a man and woman entering the store, walking to the self-checkout area, and attempting to buy a box of Oreo minis with the stolen credit card. When the transaction was declined, the pair returned the item and left the store. The footage from the Marathon gas station

---

[1] This summary is based on the trial transcript.

showed a woman attempting to purchase gas with the stolen credit card. She was wearing what appeared to be the same clothing as the woman at the Publix.

Based on the videos and other investigative work, Detective James Bowie identified Bowen and his girlfriend Dosha Marshall as suspects. The two shared an apartment in Temple Terrace near the burglarized residence, the Publix, and the Marathon gas station. On January 6, 2014, police arrested Bowen and searched his apartment. During the search, police found the Glock handgun that had been taken from Campbell and Valentine's house.

Before the search warrant was executed, Detective Bowie had begun to interview Bowen at the police station. After Detective Bowie read Bowen his *Miranda*[2] rights, Bowen invoked his right to counsel. The interview ended, and Bowen was taken to a holding area. Later that day, an officer informed Sgt. Michael Hutner that Bowen "wanted to have a conversation with" Sgt. Hutner. (*Id.*, p. 216.) Sgt. Hutner confirmed with Bowen that the latter was "initiating this conversation," that he "still underst[ood] [his] rights," and that he wished to talk to Sgt. Hutner. (*Id.*, p. 219.)

Bowen began the interrogation by denying any involvement in the burglary. He admitted that he and Marshall had tried to use the stolen credit card at the Publix. Bowen claimed, however, that he had bought the card from a man named Jamie. Bowen also said that Jamie had sold him the Glock. Later in the interrogation, Sgt. Hutner mentioned that Marshall was "looking at [a] bunch of charges too," including

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

possession of stolen property. (*Id.*, pp. 230-31.) At this point, Bowen admitted to the burglary. He said he had "smashed" the rear sliding door with a spark plug, entered the house, and taken a camera, a credit card, and a gun. (*Id.*, pp. 232-34.)

## III.   <u>Standards of Review</u>

### A.   AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme]

Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The state appellate court affirmed Bowen's convictions and sentences, as well as the denial of postconviction relief, without discussion. These decisions warrant deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

### B.     Ineffective Assistance of Counsel

Bowen alleges ineffective assistance of trial counsel. Ineffective-assistance-of-counsel claims are analyzed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires a showing of deficient performance by counsel and resulting prejudice. *Id*. at 687. Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id*. at 690. However, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

Bowen must show that counsel's alleged error prejudiced the defense, because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. To demonstrate prejudice, Bowen must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Obtaining relief on a claim of ineffective assistance of counsel is difficult on federal habeas review because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation marks and citations omitted); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013) (stating that this doubly deferential standard of review

"gives both the state court and the defense attorney the benefit of the doubt"). "The question [on federal habeas review of an ineffective-assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

**C.    Exhaustion of State Remedies; Procedural Default**

A federal habeas petitioner must exhaust his claims in state court before presenting them in his federal habeas petition. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). The exhaustion requirement is satisfied if the petitioner fairly presents his claim in each appropriate state court and alerts that court to the federal nature of the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327

(1995); *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson*, 353 F.3d at 892.

## IV.   Discussion

### A.   Ground One

Bowen contends that the trial court erred in denying his motion to suppress any evidence obtained as a result of his arrest and the search of his apartment. In his motion to suppress, Bowen argued that he was arrested without probable cause and that his apartment was illegally searched before police obtained a warrant. Following an evidentiary hearing, the trial court denied the motion. Bowen filed a motion for reconsideration, and the trial court held another hearing. At the conclusion of the second hearing, the trial court denied the motion for reconsideration and reaffirmed its prior ruling. According to Bowen, the trial court failed to give him "a full and fair opportunity to litigate the violation of his Fourth Amendment" rights. (Doc. 1, p. 9.) Bowen also claims that the denial of his motion involved an unreasonable application of clearly established federal law and was based on unreasonable factual determinations.

Respondent contends that this claim is barred by *Stone v. Powell*, which held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 428 U.S. 465, 494 (1976). Alternatively, Respondent argues that the trial court's denial of the motion to suppress is entitled to AEDPA deference. Because the Court concludes that AEDPA deference applies to the denial of the motion to suppress, it need not consider whether *Stone* bars this claim. *See Mays v. Davenport*, 560 F. App'x 958, 962 (11th Cir. 2014) (declining to address whether habeas petition was "timely," or whether "illegal arrest claim" was "precluded by *Stone*," because petition was "due to be denied on the merits").

### 1.    Factual Background

The evidence at the two suppression hearings revealed the following. In January 2014, Detective Bowie was investigating a string of burglaries in Temple Terrace. Approximately ten residences within "a mile or two" of each other had been burglarized. (Doc. 9-2, Ex. 1a, p. 258.) As part of his investigation, Detective Bowie viewed surveillance footage showing a man and a woman enter a Publix and unsuccessfully attempt to use a credit card stolen during one of the burglaries. Detective Bowie also saw footage showing a woman attempting to use the stolen credit card at a Marathon gas station. The woman appeared to be wearing the same clothing as the woman at the Publix.

Detective Bowie also learned that, on December 30, 2013, Bowen had pawned a brand-new Canon Rebel T3i camera at a pawnshop located approximately two miles from his apartment. The camera matched the description of a camera that had been stolen during one of the burglaries. Detective Bowie was not, however, able to compare the cameras' serial numbers. Several days later, on January 4, 2014, Dosha Marshall—Bowen's live-in girlfriend—pawned a Samsung Galaxy tablet at the same pawn shop Bowen had visited. This time, Detective Bowie was able to use the serial number to confirm that the tablet had been stolen from one of the burglarized houses. Detective Bowie also observed from surveillance footage that the clothing Marshall wore at the pawn shop "exactly matched" the clothing worn by the woman at the Publix and the gas station. (*Id.*, p. 266.)

On the morning of January 6, 2014, police conducted surveillance of Bowen. Law enforcement followed him as he left his probation office and walked to a pawn shop. After Bowen left the shop, Corporal Brian Bishop went inside to find out whether he had pawned anything. Corporal Bishop learned that Bowen had pawned, among other items, a gold ring inscribed with the word "Amor." (*Id.*, p. 269.) Corporal Bishop used his cellphone to send Detective Bowie pictures of the items Bowen had pawned, including the gold ring.

The ring caught Detective Bowie's attention because it "matched the description" of an item stolen during one of the burglaries. (*Id.*) Detective Bowie tried to email pictures of the ring to the victim, but she "was not able to open" the message. (*Id.*, p. 270.) According to Detective Bowie, however, he was able to describe the ring

10

to the victim over the phone, and she "confirm[ed]" that it was hers. (*Id.*) Although Detective Bowie claimed he made this call before Bowen was arrested, phone records from that day did not show any calls between Detective Bowie and the victim. For her part, the victim testified that she spoke to Detective Bowie over the phone that day, but she could not "remember the time." (*Id.*, p. 314.) In any event, after Bowen was arrested, the victim went to the police station and confirmed that the gold ring belonged to her.

After learning about the pawning of the ring, Detective Bowie believed he had probable cause to arrest Bowen. Accordingly, he directed law enforcement to arrest Bowen and began preparing an application for a search warrant for Bowen's apartment. Bowen was arrested at 10:30 a.m. and taken to the police station. As he was drawing up the search-warrant application, Detective Bowie told law enforcement to "secure" Bowen's apartment. (*Id.*, p. 272.) Approximately ten minutes after the arrest—but before the search warrant had been obtained—law enforcement arrived at the apartment.

The police knocked on the door, and Bowen's brother (Ronald Gilmore) answered. Gilmore was staying at the apartment with his two-year-old son. Law enforcement asked if they could come inside; Gilmore "told them no." (*Id.*, p. 318.) As this conversation was taking place in the doorway, Officer Bryan Campagnano noticed a laptop and a television in the living room that "appeared to be similar to the ones that [Detective] Bowie was looking for [in connection with] the cases that he was working." (*Id.*, p. 244.) But Officer Campagnano could not tell whether they were in

fact the missing items. The police ultimately ordered Gilmore and his son to leave while they secured the apartment. Law enforcement then conducted a "cursory" search to ensure "that there [were] no other unattended children being left behind" and that "there [were] no other people in there that could possible destroy evidence." (*Id.*, p. 245.) Once the apartment was secured, police waited outside for the search warrant.

Later that day, Detective Bowie finally obtained a search warrant for the apartment. The affidavit in support of the search-warrant application described the surveillance footage from the Publix and the Marathon gas station. It also noted that (1) Bowen had pawned a brand-new Canon Rebel T3i camera several days after a brand-new camera of the same make and model had been stolen during a burglary; (2) Marshall (Bowen's live-in girlfriend) had pawned a Samsung Galaxy tablet that was stolen during a burglary; and (3) Bowen had pawned a gold ring with the word "Amor" on it two days after an item matching that description had been stolen during a burglary. (*Id.*, Ex. 1, pp. 26-27.) Furthermore, the affidavit asserted that, following Bowen's arrest, law enforcement searched his apartment and "discovered an iPad mini, a TV, and other items that matched the property stolen from the several burglaries in plain view." (*Id.*, p. 28.) Based on these facts, the affidavit concluded that there was "reason to believe . . . that there [were] currently items of evidence related to an active criminal investigation" in Bowen's apartment. (*Id.*)

Law enforcement executed the search warrant at 3:00 p.m. on January 6, 2014. During the search, police recovered several items, including the Glock that had been

taken from Campbell and Valentine's house and two iPad minis that had been stolen from a different residence. As noted above, after his arrest, Bowen confessed to the burglary of Campbell and Valentine's house.

### 2.    The Trial Court's Rulings

The trial court denied Bowen's motion to suppress. First, the court ruled that the initial search of the apartment—conducted before a search warrant had been obtained—was "an illegal entry." (*Id.*, Ex. 1a, p. 349.) In doing so, the court rejected the State's argument that the initial entry qualified as a valid "protective sweep." (*Id.*) The court then turned to "the issue of probable cause for the arrest." (*Id.*, p. 352.) It found that "there was sufficient probable cause [to arrest Bowen] based on [his] pawning a ring which matched the identification of a ring that had been recently stolen." (*Id.*) Next, the court addressed "the search warrant." (*Id.*) It reiterated that the initial entry into the apartment was "illegal," but found that the unlawful entry did "not taint the warrant that was eventually obtained." (*Id.*) Accordingly, the court concluded that the warrant and the search were "still good." (*Id.*, pp. 352-53.)

Bowen subsequently filed a motion for reconsideration, arguing that (1) newly obtained cell-phone records showed that Detective Bowie did not call the victim about the gold ring before Bowen's arrest, and (2) the ring was recovered during the execution of the search warrant rather than from the pawn shop. Another evidentiary hearing was held, after which the trial court denied the motion from the bench:

> All right. The Motion for Reconsideration is denied. I reaffirm my prior ruling. The ring in my mind was a unique ring. It's a ring with Amor[]. Although Amor[] is love, it is still a unique ring.

I find that Mr. Bowie's testimony is credible regarding his making contact with the victim and describing that ring to her. Again, the evidence indicates the ring was found at the pawn shop. It was no—the officers testified there was no jewelry found at the scene of the search warrant. And clerical errors unfortunately do happen. Sometimes numbers are transposed. Sometimes wrong addresses are listed. That happens. Everybody is just human. Those kind of mistakes happen.

I think the testimony is clear that the ring was pawned. That the ring was described over the phone to the victim in the case and she confirmed that sounded like her ring. So, I'll deny the motion.

(Doc. 9-3, Ex. 1e, pp. 159-60.)

On direct appeal, Bowen argued that the trial court erred in denying his motion to suppress. (*Id.*, Ex. 2, pp. 20-23.) As noted above, the state appellate court affirmed without opinion. (*Id.*, Ex. 5.)

### 3.    This Court's Review of the Trial Court's Rulings

The trial court did not act unreasonably in denying the motion to suppress. First, the court reasonably concluded that law enforcement had probable cause to arrest Bowen for burglary. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "Probable cause exists where the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that a criminal offense has

14

been or is being committed." *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 734 (11th Cir. 2010). "[T]he probable-cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003).

Here, ample evidence supported the trial court's finding that law enforcement had probable cause to arrest Bowen for burglary. Before the arrest, Detective Bowie had been investigating a series of burglaries in Temple Terrace. The investigation revealed that (1) Bowen had recently pawned a Canon Rebel T3i camera that matched the description of a camera stolen during one of the burglaries; (2) several days later, Bowen's live-in girlfriend pawned a Samsung Galaxy tablet that had been taken during another burglary; and (3) when she pawned the tablet, Bowen's girlfriend was wearing the same clothes worn by the woman who had tried to use a credit card stolen during one of the burglaries. Furthermore, shortly before he was arrested, Bowen pawned a gold ring inscribed with the word "Amor." The ring matched the description of an item of jewelry stolen during a burglary. Finally, Detective Bowie testified that, before he ordered the arrest, he described the ring over the phone to the victim, who confirmed that it was hers.

Taken together, the "facts and circumstances within [the officers'] knowledge [were] sufficient to warrant a reasonable belief that [Bowen] had committed" burglary. *Case v. Eslinger*, 555 F.3d 1317, 1327 (11th Cir. 2009). Thus, the trial court reasonably concluded that law enforcement had probable cause to arrest Bowen for burglary. *See*

*Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996) ("Probable cause does not require overwhelmingly convincing evidence, but only reasonably trustworthy information.").[3]

Nor did the trial court act unreasonably in finding that the evidence seized pursuant to the search warrant was admissible. As noted above, the trial court found that the initial, warrantless entry into the apartment was unlawful and did not qualify as a protective sweep.[4] Accordingly, the question before the trial court was "whether the results of the subsequent search, conducted after the warrant was finally obtained, should have been suppressed." *United States v. Chaves*, 169 F.3d 687, 692 (11th Cir. 1999). "[W]here, as here, the search warrant affidavit is based on information acquired as a result of an illegal entry, [the court] must look to whether the other information provided in the affidavit is sufficient to support a probable cause finding." *Id.* "If the remaining or nonexcised information is enough to support a probable cause finding, the [next step] is [to] determine whether the officer's decision to seek the warrant was prompted by what he had seen during the arguably illegal entry." *United States v.*

---

[3] Following the arrest, Detective Bowie prepared a Criminal Report Affidavit. The probable-cause section of the Affidavit relied entirely on information obtained after the arrest. But Detective Bowie was not acting pursuant to an affidavit and judicially issued warrant when he ordered Bowen's arrest. Thus, because the arrest was "permissibly warrantless," "[a]ny defects in the later-completed arrest affidavit [were] immaterial." *Jeanty v. City of Miami*, 876 F. Supp. 2d 1334, 1345 (S.D. Fla. 2012).

[4] The trial court correctly concluded that the initial entry did not qualify as a protective sweep. Bowen was arrested approximately two miles from his apartment. "To justify a protective sweep beyond the immediate location of the arrest, officers must have reasonable suspicion 'that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" *United States v. Yarbrough*, 961 F.3d 1157, 1163 (11th Cir. 2020) (quoting *Maryland v. Buie*, 494 U.S. 325, 334 (1990)). There was no evidence that law enforcement had any basis to believe that Bowen's apartment "harbor[ed] an individual posing a danger to those on the arrest scene." *Id.*

*Noriega*, 676 F.3d 1252, 1260 (11th Cir. 2012). "Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999).

Only one piece of information in the search-warrant affidavit came from the unlawful initial entry. Specifically, the affidavit stated that, while searching the apartment, law enforcement "discovered an iPad mini, a TV, and other items that matched the property stolen from the several burglaries in plain view." (Doc. 9-2, Ex. 1, p. 28.) But even if that information were excised from the affidavit, the remaining information would be sufficient to support a probable-cause finding. In particular, the affidavit recounted that (1) Bowen had pawned a brand-new Canon Rebel T3i camera several days after a brand-new camera of the same make and model had been stolen during a burglary; (2) Bowen's live-in girlfriend had pawned a Samsung Galaxy tablet that was stolen during a burglary; and (3) Bowen had pawned a gold ring with the word "Amor" on it two days after an item matching that description had been stolen during a burglary. (*Id.*, pp. 26-27.) Those "facts and circumstances would lead a reasonably prudent person to believe that [Bowen's apartment] contain[ed] . . . evidence of a crime." *United States v. Lopez*, 649 F.3d 1222, 1245 (11th Cir. 2011).

Moreover, there was no basis to conclude that Detective Bowie's "decision to seek the warrant was prompted by what he had seen during the arguably illegal entry." *Noriega*, 676 F.3d at 1260. To the contrary, Detective Bowie testified that he began preparing the search-warrant application *before* law enforcement "secured" the

apartment. (Doc. 9-2, Ex. 1a, p. 272.) Thus, the record supports the conclusion that Detective Bowie would "have sought the search warrant even if [law enforcement] had not conducted the [unlawful] protective sweep." *Noriega*, 676 F.3d at 1263. Accordingly, the trial court reasonably concluded that the unlawful initial entry did "not taint the warrant that was eventually obtained." (Doc. 9-2, Ex. 1a, p. 352.)

In short, the trial court's denial of the motion to suppress did not involve an unreasonable application of clearly established federal law, nor did it rest on unreasonable factual determinations. For this reason, Bowen is not entitled to relief on Ground One.

### B.    Ground Two

Bowen contends that the trial court erred in denying his motion to suppress the statements he made during his post-arrest interview with law enforcement. In this motion to suppress, Bowen argued that his *Miranda* rights were violated because law enforcement reinitiated questioning after he invoked his right to counsel. Specifically, Bowen alleged that, during his initial interview with law enforcement, he "invoked his right to remain silent and law enforcement ceased questioning him." (*Id.*, Ex. 1, p. 74.) He was then taken to a holding cell. According to Bowen, Sgt. Hutner "reinitiated contact with him at his holding cell," "convinced him to make a statement," and told him that "he would have to say that Bowen reinitiated contact, not [Sgt.] Hutner." (*Id.*, p. 69.) Bowen claimed that this part of the interview "was not recorded." (*Id.*)

The trial court heard testimony on this issue from Bowen and Sgt. Hutner. During the hearing, Bowen expanded on the allegations in his motion. He reiterated

that, after he invoked his constitutional rights, he was taken to a holding cell. There, Sgt. Hutner brought him some food and told him that "he did not think [he] committed any burglary." (*Id.*, Ex. 1a, pp. 323-24.) Sgt. Hutner was then called out of the room. Approximately twenty minutes later, Sgt. Hutner returned and allegedly informed Bowen that police had "found a gun inside the apartment." (*Id.*, p. 324.) According to Bowen, Sgt. Hutner said "they were going to charge Dosha Marshall [Bowen's girlfriend] with the gun." (*Id.*) Bowen disclaimed knowledge of the gun. In response, Sgt. Hutner allegedly told Bowen that his son with Marshall was a "DCF case" and would get "t[a]ken if [he] didn't fall for the gun." (*Id.*, pp. 324-25.) Bowen then said he would speak to Sgt. Hutner. According to Bowen, Sgt. Hutner told him that, once the recording device was turned on, he would have to "admit that [he] was initiating the . . . confession." (*Id.*, p. 325.)

Sgt. Hutner offered a different account at the hearing. He testified that, around 11:30 a.m. on January 6, he walked into the holding cell where Bowen was being kept. Bowen recognized Sgt. Hutner based on a prior case Sgt. Hutner had investigated. Sgt. Hutner told Bowen that "he was arrested for the burglary investigation that [the police] were currently doing." (*Id.*, p. 300.) Sgt. Hutner then walked into the interview room with Detective Bowie and Bowen. As Detective Bowie sat down and "pulled out [his] paperwork," Sgt. Hutner left the room and returned to his desk. (*Id.*, pp. 300-01.) After Detective Bowie read him his *Miranda* rights, Bowen invoked his right to counsel, and the interview ceased. Later that day, an officer came to Sgt. Hutner's desk and "said that Akeem Bowen wanted to talk to" him or "somebody." (*Id.*, p. 301.)

19

Sgt. Hutner then "ma[d]e contact" with Bowen in the holding cell. (*Id.*, p. 302.)

According to Sgt. Hutner, his "entire contact with [Bowen]" was "recorded." (*Id.*) The

first part of the interview included the following exchange:

> [Sgt. Hutner]: Sergeant Hutner, Tampa Police. It's Monday January 6th 2:50 p.m. here with Akeem Bowen, temporary holding area. He is under arrest for burglary. Before we attempted to talk to Akeem, you told me that you wanted a lawyer present. Do you understand, is that right?
>
> [Bowen]: Yes, sir.
>
> [Sgt. Hutner]: Okay. And now you called me back in here because you want to tell me some more. So you are initiating this conversation, right?
>
> [Bowen]: Yes, sir.
>
> [Sgt. Hutner]: Do you still understand your rights?
>
> [Bowen]: Yes, sir.
>
> [Sgt. Hutner]: Do you want to talk to me or no?
>
> [Bowen]: Yes.
>
> [Sgt. Hutner]: Um-hum.
>
> [Bowen]: You're saying I'm under arrest for burglary?
>
> [Sgt. Hutner]: Yes. . . . Right now you're under arrest. That's why you are here in handcuffs. I told you, for possession of stolen property.
>
> [Bowen]: Yes, that's probably the only thing. That's the only thing.
>
> [Sgt. Hutner]: Well listen, it's to up to you if you want to talk to me about it or not.
>
> [Bowen]: I told you—I, I bought the stuff. I bought the stuff.
>
> [Sgt. Hutner]: Listen, if you want to talk to me, you called me back in here to talk to me about the stuff. If you want to tell me the stuff that that their—if you want to say, like, the reason why you called me back in

here, we can talk about that. But right now, all's I'm saying is you're under arrest right now for burglary. If there's different situations that we can verify and things turn out right, could you be charged with different things? Yeah[.]

[Bowen]: Okay.

[Sgt. Hutner]: Okay.

[Bowen]: Okay.

[Sgt. Hutner]: So I just want to make sure you understand—

[Bowen]: Yes.

[Sgt. Hutner]: —that your rights were read to you fully. You understood your rights. But you decided to have a lawyer present.

[Bowen]: Yes, sir.

[Sgt. Hutner]: Right? Is that right?

[Bowen]: Yes, sir.

[Sgt. Hutner]: Now, you, you wanted to talk to a detective so I'm in here, give you the opportunity to talk, right?

[Bowen]: Yes, sir.

[Sgt. Hutner]: I'm going to ask you some questions. You are still good with that, right?

[Bowen]: Yes, sir.

(*Id.*, pp. 303-05.)

The trial court ultimately denied the motion to suppress Bowen's statements, reasoning that "there was a sufficient lapse [after the initial invocation] and [Bowen] reinitiated the contact with the officer." (*Id.*, p. 331.) Bowen challenged this ruling on

direct appeal, and the state appellate court affirmed without opinion. (Doc. 9-3, Ex. 2, pp. 23-31; *Id.*, Ex. 5.)

The trial court did not act unreasonably in denying the motion to suppress. "[A] statement made by a suspect in custody in response to police interrogation is inadmissible against him at trial unless the police first advised him of his so-called *Miranda* rights, including the right to remain silent and the right to an attorney, and he knowingly and voluntarily waived those rights." *Lukehart v. Sec'y, Fla. Dep't of Corr.*, 50 F.4th 32, 42-43 (11th Cir. 2022) (citing *Miranda*, 384 U.S. at 484-85). "Once a suspect invokes his right to an attorney, police interrogation must stop 'until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police*.'" *Id.* (emphasis added) (quoting *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)). "A defendant 'initiates' further conversation with law enforcement when his statements evidence 'a willingness and a desire for a generalized discussion about the investigation.'" *United States v. Roper*, 842 F. App'x 477, 480 (11th Cir. 2021) (quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983)). Thus, "if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Smith v. Illinois*, 469 U.S. 91, 95 (1984).

Here, the trial court implicitly credited Sgt. Hutner's account of the interrogation. "Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review." *Consalvo v. Sec'y for*

*Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011); *see also Williams v. Johnson*, 845 F.2d 906, 909 (11th Cir. 1988) (noting that, on federal habeas review, "[i]mplicit findings regarding the credibility of witnesses are included among the findings that this Court must credit"). Bowen has not shown by "clear and convincing evidence" that the trial court's credibility determination was erroneous. 28 U.S.C. § 2254(e)(1). Accordingly, the question is whether, accepting Sgt. Hutner's version of events as true, the trial court reasonably concluded that Bowen failed to establish a *Miranda* violation.

The answer to that question is yes. After being read his *Miranda* rights, Bowen invoked his right to counsel, and the interview ended. Sometime later, according to Sgt. Hutner, an officer visited him at his desk and said that Bowen "wanted to talk to" him or "somebody." (Doc. 9-2, Ex. 1a, p. 301.) Sgt. Hutner then visited Bowen in the holding cell and asked him to confirm that he was "initiating this conversation." (*Id.*, p. 304.) Bowen answered in the affirmative. Sgt. Hutner asked Bowen whether he "still underst[ood] [his] rights." (*Id.*) Bowen responded, "Yes, sir." (*Id.*) Bowen then indicated that he wanted to talk to Sgt. Hutner. Thus, the state-court record reflects that (1) law enforcement appropriately ended the interview when Bowen invoked his constitutional rights, (2) Bowen himself initiated further conversation with law enforcement when he asked to speak with Sgt. Hutner or "somebody," and (3) Bowen's subsequent waiver of his rights was knowing, intelligent, and voluntary. Faced with this testimony, the trial court reasonably concluded that no *Miranda* violation occurred. *See Bassett v. Singletary*, 105 F.3d 1385, 1387 (11th Cir. 1997)

(holding that, after invoking "his right to counsel," defendant "initiated further conversation by inquiring 'well, what do you want, anyway?'").[5]

In sum, Bowen cannot show that the trial court's denial of the motion to suppress his statements involved an unreasonable application of clearly established federal law or rested on an unreasonable factual determination. Thus, Bowen is not entitled to relief on Ground Two.

### C.    Ground Three

Bowen contends that the trial court violated his Sixth and Fourteenth Amendment rights by instructing the jury on the theory of principals. "To convict under a principals theory, the State is required to prove that the defendant had a conscious intent that the criminal act be done and . . . the defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist, or advise the other person or persons to actually commit or attempt to commit the crime." *Hall v. State*, 100 So. 3d 288, 289 (Fla. 4th DCA 2012). Bowen maintains that the principals-theory instruction violated his constitutional rights because (1) the theory was not included in the information, and (2) there was "no evidence to support an aiding an[d] abetting theory of guilt[]." (Doc. 1, p. 22.)

---

[5] To be sure, Sgt. Hutner did not reread Bowen his *Miranda* rights during the second interview. But there is no Supreme Court precedent requiring law enforcement to readvise a suspect of his *Miranda* rights in these circumstances. *See United States v. Knight*, No. 1:06-cr-514-CAP/AJB, 2007 WL 9718818, at *13 (N.D. Ga. Aug. 7, 2007) ("[T]he Court agrees with the government that [law enforcement]  was not required  to repeat the *Miranda* warnings  to  [defendant]  after  [defendant] voluntarily requested [law enforcement] to come see him at the Fulton County Jail."), *adopted by* 2007 WL 9718823 (N.D. Ga. Nov. 13, 2007), *aff'd*, 336 F. App'x 900 (11th Cir. 2009).

Respondent correctly contends that Bowen failed to exhaust this claim. Proper exhaustion requires a petitioner to "make the state court aware that the claims asserted present federal constitutional issues." *Jimenez v. Fla. Dep't of Corr.*, 481 F.3d 1337, 1342 (11th Cir. 2007). "A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Baldwin v. Reese*, 541 U.S. 27, 32 (2004). A petitioner must do more, however, than "scatter some makeshift needles in the haystack of the state court record." *McNair v. Campbell*, 416 F.3d 1291, 1303 (11th Cir. 2005). For example, "one passing reference to the Due Process Clause . . . is insufficient to notify [a] state court that [a petitioner] [is] raising a federal claim." *Copeland v. Fla. Dep't of Corr. Sec'y*, 851 F. App'x 927, 931 n.1 (11th Cir. 2021).

On direct appeal, Bowen argued that the trial court erred by instructing the jury on the principals theory "when [that] theory was not charged in the information" and "the evidence did not support the instruction." (Doc. 9-3, Ex. 2, p. 32.) The only reference to the federal constitution appeared in the section headings of Bowen's appellate briefs. Those headings stated that the trial court violated the "due process and notice provisions of the United States Constitution" by giving an instruction that was not charged in the information. (*Id.*; *see also id.*, Ex. 4, p. 8.) Setting aside that bare reference to the federal constitution, Bowen couched his argument entirely in terms of state law. He did not cite any federal cases, nor did he apply federal standards to the

facts. Instead, he relied entirely on Florida appellate opinions—none of which rested on federal constitutional grounds. As a result, Bowen failed "to afford the state courts a meaningful opportunity to consider" his federal claim. *McNair*, 416 F.3d at 1302; *see also Ramos v. Sec'y, Fla. Dep't of Corr.*, 441 F. App'x 689, 696-97 (11th Cir. 2011) (holding that petitioner failed to "fairly present" federal issue on appeal because he "mention[ed] his federal constitutional rights only in an opening paragraph" of his brief and did not "argue federal standards" or "include references to federal case law"); *Hartley v. Sec'y, Fla. Dep't of Corr.*, No. 3:08-cv-962-MMH-LLL, 2022 WL 3099256, at *20 (M.D. Fla. Aug. 4, 2022) (finding that petitioner failed to fairly present federal claim because, "[o]ther than the heading of the claim, [he] did not cite to the United States Constitution or rely on federal case law in arguing [his] claim to the Florida Supreme Court; instead, he relied solely on cases applying Florida law").

Bowen cannot return to state court to present his unexhausted claim in a second, untimely direct appeal. *See* Fla. R. App. P. 9.140(b)(3) (stating that a notice of appeal must be filed within thirty days of the rendition of a sentence). As a result, Ground Three is procedurally defaulted. *See Smith*, 256 F.3d at 1138 ("If the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established."). Bowen has not shown

that an exception applies to overcome the default.[6] Thus, Ground Three is barred from federal habeas review and affords Bowen no relief.

Even if Bowen had exhausted this claim, he would not be entitled to relief. As an initial matter, no clearly established federal law required the State to allege in the information that it would be trying Bowen under a principals theory. *See United States v. Martin*, 747 F.2d 1404, 1407 (11th Cir. 1984) ("Aiding and abetting need not be specifically alleged in the indictment . . . ."); *United States v. Tucker*, 402 F. App'x 499, 502 (11th Cir. 2010) ("The district court did not err, plainly or otherwise, when it gave an aiding-and-abetting instruction to the jury, although such a theory of guilt was not alleged in the indictment."); *Emil v. Baker*, 667 F. App'x 277, 278 (9th Cir. 2016) (noting that "there is no Supreme Court precedent holding that due process requires an information to specifically allege a theory of aiding and abetting"); *see also Ford v. State*, 306 So. 3d 417, 422 (Fla. 1st DCA 2020) ("[A] defendant need not be charged as a principal to support a conviction as a principal.").

Bowen also contends that the trial court should not have given the principals-theory instruction because there was "no evidence to support an aiding an[d] abetting theory of guilt[]." (Doc. 1, p. 22.) Even assuming that the challenged instruction was unsupported by any evidence, Bowen is not entitled to relief. The trial court did give a

---

[6] In addressing Ground Three in his reply, Bowen cites *Martinez v. Ryan*, 566 U.S. 1 (2012). But *Martinez* cannot excuse the default of a claim of trial-court error. *See Gore v. Crews*, 720 F.3d 811, 816 (11th Cir. 2013) ("By its own emphatic terms, the Supreme Court's decision in *Martinez* is limited to claims of ineffective assistance of trial counsel that are otherwise procedurally barred due to the ineffective assistance of post-conviction counsel.").

principals-theory instruction, but it also provided instructions that would allow the jury to find Bowen directly responsible for the charged offenses. (Doc. 9-2, Ex. 1d, pp. 321-36.) As the factual summary above makes clear, the jury heard overwhelming evidence that Bowen himself committed burglary and grand theft. The Supreme Court has held that "it [is] no violation of due process [for a] trial court [to] instruct[] a jury on two different legal theories, one supported by the evidence, the other not." *Sochor v. Florida*, 504 U.S. 527, 538 (1992); *see also Galmore v. Hanks*, 85 F.3d 631, 631 (7th Cir. 1996) (holding that "the aider and abettor instruction, even if unsupported by any evidence . . ., did not violate [petitioner's] due process rights," because "sufficient evidence [existed] to support his conviction as a principal on the criminal deviate conduct charge"); *Phillips v. Sec'y, Fla. Dep't of Corr.*, No. 3:15-cv-602-TJC-JBT, 2018 WL 3974109, at *10 (M.D. Fla. Aug. 20, 2018) (holding that state court "did not err in reading the principal instruction to the jury" because, among other things, "there was legally sufficient evidence to convict [petitioner] without the use of the principal theory").[7]

### D.    Ground Four

Finally, Bowen argues that his trial counsel provided ineffective assistance by "misadvising [him] about the consequences of [a] plea bargain." (Doc. 1, p. 23.) Bowen notes that, in addition to the charged offenses, he faced multiple probation

---

[7] To the extent that Bowen alleges the trial court's principals-theory instruction was erroneous as a matter of state law, such a claim is not cognizable on federal habeas review. *See, e.g.*, *Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988) ("[A] habeas petition grounded on issues of state law provides no basis for habeas relief.").

violations at the time of trial. According to Bowen, after several rounds of negotiations, the State ultimately agreed to a "global" plea deal in which he would receive ten years' imprisonment followed by ten years' probation. (*Id.*, pp. 23-24.) Bowen contends that, because the "plea offer encompass[ed] all of the violations of probation," the "trial court would have to structure all of his sentences, including the [probation-violation] sentences, according to the global agreement of ten years['] prison, followed by ten years of probation." (*Id.*, p. 24.) Yet, according to Bowen, trial counsel mistakenly advised him that the plea deal "was only on the new charges and he could still get 30 years['] prison on the violation of probation cases." (*Id.*, p. 25.) Bowen maintains that, as a result of this allegedly incorrect advice, he rejected the plea deal and proceeded to trial, "at the conclusion of which he was sentenced to life in prison." (*Id.*, p. 24.)

Following an evidentiary hearing, the state court denied this claim as follows:

Defendant alleges ineffective assistance of counsel for misadvising Defendant about the consequences of the plea bargain. Defendant alleges he was charged with numerous crimes contained in multiple Informations together with five counts of violation of probation. He alleges the State originally offered him 18 years' prison followed by 10 years' probation. He alleges he rejected the offer based on counsel's advice that if the suppression motion were granted, it would weaken the State's case. He alleges, however, that all motions were denied.

Defendant alleges the State later made offers of 15 years' prison followed by 10 years' probation, and 12 years' prison followed by 10 years' probation. He alleges on October 1, 2014, the State told counsel it would consider a reasonable offer proposed by Defendant, to which Defendant responded with a counteroffer of 10 years' prison followed by 10 years' probation. Defendant alleges the State accepted his counteroffer.

Defendant alleges, however, when he discussed the matter with counsel, counsel advised him that the trial judge "would still be authorized to sentence him to 30 years in prison for the probation violations regardless

of the plea negotiations with the State on these specific charges." Defendant alleges he rejected a plea deal based on this advice and proceeded to trial, at the conclusion of which he was sentenced to life in prison.

Defendant alleges counsel misadvised him because the plea deal was a global plea offer encompassing all the charges and all of the violations of probation. Defendant alleges that counsel should have advised him if he accepted the global offer, it meant the trial court would have to structure all of his sentences, including the [probation-violation] sentences, according to the global agreement of ten years' prison followed by ten years' probation. Defendant alleges if he had been so advised, he would not have rejected the plea offer.

Defendant alleges the trial court would not have rejected the offer, which is supported by the court's instruction that "both parties should get together and try to reach an agreement to resolve all of the cases as a whole." He alleges the State would not have withdrawn the offer as the State initiated the negotiations and accepted his counteroffer. Finally, he alleges the life sentence he received is more severe than the offer of ten years' prison followed by ten years' probation.

At the evidentiary hearing, Defendant testified he made a counteroffer of ten years' prison followed by ten years' probation, which he intended to be a global offer to encompass all of his charges. He testified his attorney advised him that the counteroffer was only on the new charges and he could still get 30 years' prison on the violation of probation cases. Defendant testified this conversation took place in the courtroom and lasted ten minutes at most. He testified he told his attorney he thought the offer was for all of his cases and his attorney responded that the State did not have any weight over the probation violations. Defendant testified his attorney told him he could receive 30 years' prison on the probation violations. Defendant testified he abandoned his counteroffer based on counsel's representation that he could still get 30 years' prison on the violations. He testified if he had been told the offer was [a] global offer, he would have accepted the offer.

Defendant's attorney, Shawn Goforth, also testified at the evidentiary hearing. Mr. Goforth testified the State made an offer on September 22, 2014, of twelve years' prison with a ten-year minimum mandatory followed by ten years' probation. He testified Defendant rejected the offer and countered with an offer of a ten-year minimum mandatory followed by ten years' probation. Mr. Goforth testified his notes do not reflect that

this was a global offer, but all of the offers he would have taken to Defendant would have been to wrap up all of his cases. He testified he had never been involved in a case where the State wanted to resolve only one or two cases and not all of them.

Mr. Goforth testified that after the State accepted Defendant's offer of ten years' prison followed by ten years' probation, the next step—if Defendant ha[d] not rejected the offer—would have been to go to the judge. He testified this particular judge always wanted to handle his violations of probations. He testified he would have presented the agreement to the judge and asked if the judge agreed to it. Mr. Goforth testified it was his intent for Defendant's counteroffer to be a global offer and the next step would have been to "get the judge on board for that." Mr. Goforth testified he never told Defendant the offer only encompassed the new charges.

On cross-examination, Mr. Goforth testified that he would have discussed with Defendant that if the State accepted his counteroffer, they would still need to present the agreement to the judge to ascertain if the judge would agree to the sentence. He also testified he would have told Defendant that Defendant would not have to enter into the agreement if the judge did not agree to the sentence. He testified when Defendant rejected the counteroffer, they did not get to see what the judge was going to do with regard to the violations.

The Court finds the testimony of Mr. Goforth to be credible based on his demeanor in court. Based on his testimony, the Court finds Mr. Goforth did not advise Defendant that the offer of ten years' prison followed by ten years' probation encompassed solely the new charges and that Defendant would still be sentenced up to 30 years[] on the violations. The Court finds that before Defendant and his attorney could find out if the trial judge would have accepted the parties' agreement as to all of Defendant's charges and cases, Defendant rejected the offer. Consequently, the Court finds Defendant has not established deficient performance.

(Doc. 9-4, Ex. 11, pp. 206-09 (record citations omitted).)

The state court reasonably rejected Bowen's ineffective-assistance claim.[8] "Before deciding whether to plead guilty, a defendant is entitled to the effective assistance of competent counsel." *Padilla v. Kentucky*, 559 U.S. 356, 364 (2010). Erroneous advice about the consequences of pleading guilty can support a finding of deficient performance. *See, e.g.*, *Goudie v. United States*, 323 F. Supp. 2d 1320, 1330 (S.D. Fla. 2004) ("Several Circuits, including the Eleventh, have [] held that a defense attorney's unreasonably inaccurate advice to his or her client related to accepting or rejecting a proposed plea agreement can rise to the level of ineffective assistance." (collecting cases)), *aff'd*, 132 F. App'x 823 (11th Cir. 2005). But "[w]ithout evidence that [counsel] gave incorrect advice or evidence that he failed to give material advice, [a petitioner] cannot establish that [counsel's] performance was deficient." *Burt v. Titlow*, 571 U.S. 12, 23 (2013).

Here, the state court credited trial counsel's testimony about his conversations with Bowen concerning the State's plea offers. As noted above, "[d]etermining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review." *Consalvo*, 664 F.3d at 845. Bowen has not shown by "clear and convincing evidence" that the state court's credibility determination was erroneous. 28 U.S.C. § 2254(e)(1). To the contrary, the state court accurately

---

[8] The state court did not cite *Strickland* in its discussion of this claim. But "[a] state court's decision is not 'contrary to . . . clearly established Federal law' simply because the court did not cite [relevant Supreme Court] opinions." *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003). Indeed, "a state court need not even be aware of [relevant Supreme Court] precedents, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Id.*

summarized the testimony Bowen and trial counsel gave at the evidentiary hearing. Thus, Bowen has failed to establish that the rejection of his ineffective-assistance claim rested on "an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2).

Nor has Bowen shown that the state court unreasonably applied *Strickland* in rejecting his ineffective-assistance claim. That claim rests on the assertion that trial counsel mistakenly advised Bowen that the plea deal "was only on the new charges and he could still get 30 years['] prison on the violation of probation cases." (Doc. 1, p. 25.) As the state court explained, trial counsel testified that he did *not* "tell [Bowen] that the State's offer only encompassed the new charges." (Doc. 9-4, Ex. 11, p. 189.) To be sure, trial counsel also recounting telling Bowen that, if he accepted the offer, "[they] [would] still have to go to [the trial court] and see if [it would] agree to th[e] [proposed] sentence as it relates to the violations of probation." (*Id.*, p. 198.) But this advice was accurate. The Florida Supreme Court has explained that "Florida's trial courts are not bound by any plea agreement." *Alcorn v. State*, 121 So. 3d 419, 430 (Fla. 2013); *see also* Fla. R. Crim. P. 3.171(a) ("Ultimate responsibility for sentence determination rests with the trial judge.").

Moreover, although trial counsel could not specifically recall telling Bowen that the plea deal was "global," he testified that "all offers [he] would have taken to him would have been the offer to wrap everything up." (Doc. 9-4, Ex. 11, p. 188.) Trial counsel elaborated that, "[n]ever once in [his] 11 years with the office, and practicing criminal law[,] had the State wanted to resolve one or two cases and not all of them." (*Id.*) Trial counsel also testified that, in his discussions with Bowen concerning the

"counteroffer to the State . . . of ten years," trial counsel's "intent" was that this would "be a global offer." (*Id.*, p. 189.)

In light of the state court's reasonable credibility determination, Bowen has failed to show that the rejection of his ineffective-assistance claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Furthermore, because the state court reasonably concluded that Bowen failed to establish deficient performance, this Court need not address the prejudice prong. *See Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the [*Strickland*] test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa."). Accordingly, Bowen is not entitled to relief on Ground Four.[9]

It is therefore **ORDERED** that Bowen's petition (Doc. 1) is **DENIED**. The **CLERK** is directed to enter judgment against Bowen and to **CLOSE** this case.

<u>Certificate of Appealability</u>
<u>and Leave to Appeal *In Forma Pauperis* Denied</u>

It is further **ORDERED** that Bowen is not entitled to a certificate of appealability ("COA"). A prisoner seeking a writ of habeas corpus has no absolute

---

[9] To the extent that Bowen charges his trial counsel with affirmatively advising him to go to trial rather than plead guilty, that claim was not presented in state court and is therefore unexhausted. Because Bowen cannot return to state court to present this claim in a second, untimely postconviction motion, *see* Fla. R. Crim. P. 3.850(b), the claim is procedurally defaulted. Additionally, Bowen has not established that an exception applies to overcome the default.

entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Rather, a COA must first issue. *Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To obtain a COA, Bowen must show that reasonable jurists would find debatable both (1) the merits of the underlying claims and (2) the procedural issues he seeks to raise. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Bowen has not made the requisite showing. Finally, because Bowen is not entitled to a COA, he is not entitled to appeal *in forma pauperis*.

**ORDERED** in Tampa, Florida, on March 3, 2023.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE